GANDÍA v. PIZÁ HERMANOS, S. EN C.

APPEAL from the District Court of San Juan, Section 1.

No. 683.—Decided June 20, 1911.

DISMISSAL OF APPEAL—TIME TO MOVE FOR DISMISSAL.—In accordance with rule 62 of the Rules of the Supreme Court, a motion for the dismissal of an appeal must be made before the hearing thereof. If this is not so done, dismissal being moved for at the hearing, the motion must be overruled.

PROFITS OF MERCANTILE PARTNERSHIP—NET PROFITS.—The word "profit," when used in relation to a mercantile concern, is generally equivalent to the term "net profits."

JUDGMENT ACCORDING TO LAW—ERRONEOUS REASONINGS.—When a judgment is just and in accordance with law it should not be reversed because some of the reasonings stated in the opinion in support thereof are erroneous.

INDUSTRIAL PARTNER—CONTRACT OF MERCANTILE PARTNERSHIP—ATTORNEY IN FACT OF COMMERCIAL FIRM.—After examining the evidence, and considering that the plaintiff was not a party to the partnership contract of the defendant firm, and that he did not ratify the execution thereof, the court held that he could not be considered as an industrial partner, but as an employe of the defendant concern, and as such he was designated in the partnership contract.

CONFORMITY OF COMPLAINT WITH EVIDENCE.—The conformity which should exist between the allegations of the complaint and the evidence must not be literal but substantial, and the facts stated in the complaint may be supplemented with the evidence introduced.

INCREASED VALUE OF AN ESTATE—NET PROFITS OF MERCANTILE PARTNERSHIP—SHARE OF EMPLOYE IN SUCH PROFITS.—Considering that in the several balances struck by the defendant partnership the increased value of their rural properties as the result of time and favorable economic conditions in the Island were included as net profits of the partnership, the trial court committed no error in deciding that, it having been stipulated that the plaintiff was entitled to 10 per cent of the net profits, 10 per cent of the increase in the value of the estates should also be included and considered as part of the net profits.

LIQUIDATION OF NET PROFITS OF MERCANTILE PARTNERSHIP—UNGATHERED CROPS.—The provisions of article 225 of the Code of Commerce are not applicable to the employes of a firm, but refer to the partners only.

ID.—UNGATHERED CROPS—DATE FOR DETERMINING NET PROFITS OF MERCANTILE PARTNERSHIP.—Upon the withdrawal therefrom of an employe, who is attorney in fact of a firm and whose compensation was fixed at a monthly salary and 10 per cent of the net profits, he has the right to demand a valuation of the crops ungathered at the time he withdraws from such firm, and to demand that the 10 per cent of the net profits, including the value of said ungathered crops, be determined, not being bound to wait for the harvest thereof. No profit or loss sustained in said harvest after the date of the withdrawal of said employe-attorney can affect him.

PAYMENT OF EMPLOYE'S SHARE IN NET PROFITS OF PARTNERSHIP—RECEIPT OF AMOUNT THEREOF IN CASH, MERCHANDISE, ACCOUNTS, AND OTHER PROPERTY.—After examining the evidence introduced at the trial, the Supreme Court held that the plaintiff had a right to the payment in cash of his 10 per cent share in the net profits of the partnership, not being bound to receive the same proportionately in cash, merchandise, accounts, and other property of the firm, because, besides the verbal contract between the plaintiff and the defendant firm, which is proved by the record, from the balances struck by the latter it is shown that the plaintiff's account was credited with 10 per cent of the profits and that he disposed of over $5,000 on account of such 10 per cent.

The facts are stated in the opinion.

Mr. Juan Hernández López for appellants.

Mr. Antonio Sarmiento for respondent.

MR. JUSTICE MACLEARY delivered the opinion of the court.

The plaintiff, Ricardo A. Gandía Caldentey, brought suit in the District Court of San Juan on March 31, 1910, against the defendants, Pizá Brothers, a commercial firm, to recover the sum of fifteen thousand three hundred and fifty-eight dollars and twenty-three cents ($15,358.23) claimed to be due him as compensation for his services to the said firm, as employe and agent, by virtue of a contract made with said defendants on October 15, 1902, said services being rendered between the said date and March 11, 1910. It is alleged in the complaint that the terms of the contract were that plaintiff should receive from the defendants as his compensation one hundred and forty dollars ($140) per month, as salary, and ten per cent (10%) of the net profits of their business additional thereto. During the seven years and more that respondent was in the employ of appellants he received large sums of money from time to time, and on leaving their service on the date aforesaid it seems to have been tacitly admitted that there was due him a cash balance of seven thousand four hundred and sixteen dollars and seventy cents ($7,416.70), but the rest of the claim, amounting to seven thousand nine hundred and forty-one dollars and fifty-three cents ($7,941.53), was earnestly disputed and vigorously resisted. After various proceedings a trial was finally had before the District Court of San Juan, which resulted in a judgment in favor of the plaintiff for the full amount claimed. From that judgment an appeal was taken to this court.

Respondent seeks in his brief, and did in his oral argument, to have the appeal dismissed, or at least not considered, because of formal defects in the preparation and presentation of the transcript, and has devoted a lengthy discussion to that point. But this movement is effectually met by the appellants with a citation of rule 62 of this court, which provides that all matters of this kind must be presented and disposed of prior to the trial here. Thus it is that such objections come too late at the hearing and we must take up

the case as it is presented in the record, and dispose of it on its merits.

In their brief the appellants complain of seven errors alleged to have been committed by the trial court, and set them out in detail as follows:

"*1st*. The judgment is erroneous in the consideration made by the court of the facts establishing the terms in which the parties agreed with each other in regard to the contract made between Messrs. Gandía and Pizá.

"*2d*. The judgment is erroneous, both as to law and fact, in not considering Mr. Gandía as an industrial partner of the firm of Pizá Brothers, and in regarding him as only an employe.

"*3d*. The judgment is erroneous, in law and in fact, in accepting the terms of the contract made between Messrs. Gandía and Pizá in the manner in which it was stated by Mr. Gandía in his testimony.

"*4th*. But conceding that the plaintiff was only an employe of the house of Pizá Brothers and nothing more, and even accepting all the terms of the contract just as the plaintiff himself testified them to be, the judgment is erroneous in violating said contract, which is the fundamental law in the matter of this suit.

"*5th*. The judgment is erroneous in granting profits from a business which was pending and which had not been and could not yet have been the subject of liquidation.

"*6th*. The judgment is erroneous in granting to the plaintiff profits from the crops of canes and pines at 'Santa Bárbara' and 'Sabana Seca,' it being the fact that said crops had caused a loss to the firm of Pizá Brothers.

"*7th*. Finally, the judgment is erroneous in admitting as net profits the supposed profits of those fields and plantations, which did not arise from a balance struck between the expenses and the income, in order to reach a sure and certain conclusion pro and con of the true balance."

Let us now examine these several propositions in the order in which they have been presented by the appellants.

*First.* Then did the trial court err in the construction put upon the terms of the contract made between the parties? It is said by the respondent that the appellant fails to cite

any statute or decision which has been violated or disre-
garded in the consideration of the facts by which the contract
was established or in the construction put thereon. But
let that pass, and we will inquire into the manner in which
the judge arrived at his conclusion as to the terms of this
contract. The trial court in its opinion says:

"*2d.* That the compensation agreed upon between plaintiff and
defendants for such service was one hundred and forty dollars ($140)
per month and ten per cent (10%), of the profits on the partnership
capital."

Counsel cites the testimony of the plaintiff to the effect
that the contract was that he was to receive ten per cent
(10%) of the *net* profits, which were credited in his private
account, the only one which he had, and that there was no
account of profits to be thereafter liquidated. The error
assigned seems to be that the court omitted the word *net*
from its summary. If this inadvertent omission was an
error it was harmless, as the *net* profits were the only ones
taken into account when the court came to sum up the items
and render the judgment. In ordinary use the term profits
generally means such as arise after all incomes and disburse-
ments are considered and is thus equivalent to *net profits*
unless they are stated to be *gross profits.* No doubt such was
the sense in which the trial judge used the term profits in pre-
paring the opinion to which reference is made. If the trial
judge erred in this particular it may be that he was led into
the mistake by the language of the partnership contract,
made by the appellants between themselves, in which it is
stated that, on ceasing to be employes, the respondent and
another should have paid to them that part of the *profits*
(*not net profits*) to which they might be entitled. And,
besides, this error, if it were such, appears only in the
opinion of the trial court and not in the judgment. If the
judgment is correct the motives on which it is founded may
be wrong and still the judgment will stand, as we have fre-

quently decided. Then the first assignment lacks merit sufficient to demand further consideration.

. *Second.* Should the court in its judgment have considered the respondent as an industrial partner of the appellants' firm and not merely as an employe? The appellants admit that the respondent was an employe, but they claim that he was at the same time an industrial partner, and should have been treated as such in the trial of this case and the rendition of the judgment from which this appeal was taken. Let us see what the law regards an industrial partner to be. Surely he is a partner of some sort and must have that status before he can be classified as industrial, special, general or otherwise. A partnership according to our Civil Code (section 1567) is "a contract by which two or more persons bind themselves to contribute money, property, or industry to a common fund with the intention of dividing the profits among themselves." To the same effect are articles 116 *et seq.* of the Commercial Code. And when real property is contributed by one of the partners the partnership must be established by a public instrument. (Section 1569 of Civil Code.) The partnership of Pizá Brothers, in this case, was formed by such an instrument. But the respondent was not a party to it; he did not agree to the making of it nor sign it, nor even see it until months after it was made and registered. How could he be a party to a written instrument of whose very existence he had no knowledge? And it is prescribed explicitly in our Civil Code (section 1224) that contracts, for partnerships, as well as others, are only valid between the parties who execute them. Besides, in the written contract of partnership of the appellants, in the single clause wherein the respondent is mentioned, he is termed an employe and not a partner. Then the plaintiff, not being a signer of the written instrument, was not bound by the partnership contract and was not a partner of the firm of Pizá Brothers, industrial or otherwise.

*Third.* Did the trial court err in accepting the version of

the contract of employment given by the respondent in his
testimony? The testimony of the plaintiff (respondent here)
was entitled to consideration the same as should be given to
that of any other witness, making allowances of course for
the fact that he was interested in the result of the suit. But
the appellants contend that this testimony does not accord
with the allegations made in the complaint and the deadly
parallel is drawn between them. In his brief counsel for
appellants says that plaintiff in his complaint alleges:

"*3d.* That from the 15th day of October of the year 1902, on
which he was appointed as an employe by the defendant company,
the petitioner has rendered his services to the aforementioned firm
as such an employe up to the 11th day of the present month of March,
1910.

"*4th.* That the compensation agreed upon for said services was
one hundred and forty dollars ($140), as salary per month and
ten per cent (10%), of the net profits."

Then it is urged that the respondent as a witness adds
to these allegations that the ten per cent (10%) "of the
net profits was credited to him after each balance, together
with his salary in his private account, and that all those
profits and his salary were then at his complete disposal,
and that, according to the provisions of the code, the bal-
ances were to be made annually, or within a period as ap-
proximate as possible thereto." This statement is not, in
our view, contradictory to the allegations contained in the
complaint, but only explanatory thereof. In the pleadings
the evidence should not be set out exactly as it is to appear
on the trial, but only the ultimate facts are required to be
alleged. The allegations and the proof should correspond,
it is true; however, this agreement is not to be literal, but
substantial, and the proof must necessarily be more elab-
orate than the allegations. The witness could properly state
in his testimony how the salary and compensation had pre-
viously been paid in carrying out the contract and how the
credits to which he was entitled had been entered on his

account. The testimony was not at variance with the complaint, but in harmony therewith.

Moreover, the testimony of the respondent is supported by other evidence contained in the record. On inspection of the five balances, which were struck by the appellants, showing the condition of their business in the years 1904, 1905, 1906, 1907, and 1910, they all show that Gandía and Pico were credited with the 10 per cent of the profits claimed, and that these credits were subject to their drafts. Then the trial court did not err in accepting the respondent's version of the contract as correct.

*Fourth.* But it is alleged as an error that the judgment is contrary to the contract made between the parties, and that the contract is the law of the case. Let us see. Of course the contract must be accepted as fixing the rights and obligations of the parties in this suit, or, as it is expressed "is the law of the case." The particular matter aimed at in this assignment seems to be that under the contract the plaintiff could receive only ten per cent (10%) of the *net* profits, and that he left his employment on March 11 and claimed his interest in the net profits up to that time on a valuation then made of the partnership capital, including the plantation "Santa Bárbara"; and that the judgment erred in conceding to the plaintiff ten per cent (10%) of the difference in the value of said estate on that date and the cost of the same to the firm as shown by the inventory. Objection is made to receiving the testimony of the experts on this matter. The value of the plantation "Santa Bárbara" at the time the respondent left the employ of the appellants is deemed to be immaterial to the issues in this action, it being asserted that the respondent had no interest therein, but only in the crops growing thereon. It is contended that the increased value of this landed property, belonging to the firm as a part of its capital, cannot be considered as net profits in which the plaintiff had a right to participate. It is said that this increase, this unearned increment, is the

result of time and favorable economic circumstances, which have affected all landed property in this Island since 1900, and especially such land as is devoted to the *culture* of sugar-cane and pineapples. It seems to be forgotten that this estate was purchased at a low price and that the plaintiff himself, as agent of the firm, made the trade, and secured the bargain. But that matter need not be taken into account.

The increased value of the real estate was, under the terms of the contract of employment, properly considered a part of the net profits. This is also shown by the fact that in the balances struck in the years 1904, 1905, and 1906 this increase was considered as net profits and the plaintiff was credited with ten per cent (10%) thereof as a part of his compensation. He drew from time to time his salary of one hundred and forty dollars ($140) per month, and, besides, more than five thousand dollars ($5,000) on account of the net profits of which this increased value of the real estate formed a part. In the same way in the balances struck in 1907 and 1910 the plaintiff is set down as a creditor of the firm in the sums of nine thousand four hundred and fifty dollars and thirty-three cents ($9,450.33) and seven thousand seven hundred and eighty-nine dollars and fifty-seven cents ($7,789.57) respectively. In these sums this increase in the value of "Santa Bárbara" is included to make up the respective amounts stated. And in the business of such a firm as that of the appellants, conducting various mercantile establishments, sugar plantations, and pineapple farms, and dealing in real estate, all sources of profits are properly included in the balance sheet when estimating the net profits derived from the business. Then the fourth assignment is not well founded.

*Fifth.* Was it an error in the judgment to give the respondent credit for profits derived from the appellants' business which was still pending at the date when the suit was begun and could not then have been the subject of liquidation? In support of an affirmative answer to this proposition the

counsel for appellants cited article 225 of the Commercial Code. This article has reference to a partner retiring from a firm and has nothing to say about employes. Then if the plaintiff was an employe and not a partner the article quoted has no application. An employe can retire whenever he chooses, so that he does not violate the contract by which he came to be employed. And this article of the Commercial Code cannot be applied by analogy to the case of employes or an attorney in fact, since the circumstances, rights, and obligations existing between them and the firm are entirely different from those which surround and appertain to the partners among themselves. This assignment when properly construed really turns on the meaning given to the words *net profits.* According to the view taken by the trial court, in which we concur, this could be ascertained at any given date and the respondent could justly claim to have his compensation fixed on the basis of the net profits as they stood on March 11, 1910, the date when he left the employment of appellants' firm. One slight circumstance corroborates the general current of testimony which justifies the view contended for by the respondent. It may be mentioned. In striking the balance in 1904 the appellants include in it as a part of the cash assets 22,000 quintals of cane which were yet to be ground. The construction which the respondent now contends for, and which was adopted by the trial court, was the same which the appellants voluntarily assumed seven years ago. The employe Gandía had no right to participate in any gains arising after the date of his resignation, nor was he liable to have his compensation reduced by subsequent losses. The business of the firm went on as usual after the retirement of this employe and neither he nor the firm was affected by it in any way whatever. Hence this assignment is not well taken.

*Sixth.* Was the respondent entitled to profits from the crops of cane and pines on the two plantations "Santa Bárbara" and "Sabana Seca," supposing the firm to have sus-

tained a loss on the said crops? The same reasoning applied to the last proposition applies also to this. The balance was correctly struck on March 11, 1910, and the value of the crops on that date was the sum on which the ten per cent (10%) coming to the respondent was to be calculated. Any gains or losses occurring thereafter concerned the appellants alone and the respondent had no participation therein. All testimony in regard thereto, that of Pico among the rest, was irrelevant, and it matters not what it showed. It was properly admitted, since the plaintiff at the trial made no objection thereto, but the trial court correctly disregarded it in making up the decision of this case. Suppose the prices of fruit and sugar had in the meantime, between March 11 and September 6, the dates of the discharge of respondent from the appellants' service and the trial of the cause, doubled or trebled the increased profits would have inured solely to the benefit of the firm and the employe would have had no right to participate therein. So in case another tornado had swept over this Island on August 8 and entirely destroyed the crops on the plantations mentioned, the appellants alone would have had to bear the loss and it could not have affected the rights of the respondent. His compensation is fixed by a valuation of the property made at the date of his discharge and not at any date subsequent thereto. The testimony of the experts in regard to the value of the crops at ''Santa Bárbara'' and ''Sabana Seca'' was perfectly competent and was properly admitted. Besides, no objection was made thereto on the trial, and it is too late to make them in this court. Then it is unnecessary to follow the lengthy and ingenious argument of the appellants' counsel in regard to the proper construction to be put upon the law of evidence and the other statutes relating to this question, as it is based entirely on what we consider an erroneous view of the fundamental matter involved herein.

*Seventh.* Then, finally, did the trial court err in admitting as net profits the estimated products from the crops which

had not yet been gathered and from which the expenses and the income were as yet unknown, as is substantially stated in the seventh assignment of errors? In making this claim counsel for appellants clings to the theory that the employe, in analogy to a retiring partner, must await the final outcome of all business ventures, the raising of crops among the rest, before his share in the net profits can be ascertained. But we may repeat that this analogy does not hold between partners and employes. As we have heretofore stated, on the severance of the relations between this firm and its employe, the actual cash value of his interest in the business as it stood, on the date of his resignation, should have been correctly ascertained, and his compensation fixed accordingly and paid to him in cash then and there. This was the contract as the facts produced in the record show; and we must, as insisted on by the distinguished counsel for appellants, accept the contract of employment as the law of this case and decide it accordingly. The court below did so, as we understand the matter, and its judgment was correct.

But to resume, this whole case really turns on three points of disagreement between the parties, which are or may be stated as follows:

*First.* In what form has the respondent to receive the ten per cent (10%) of the profits? He affirms that he ought to receive the same in cash, while the appellants allege that he ought to receive them proportionately in cash, merchandise, bills, and other property of the partnership in accordance with the clause inserted in the deed of partnership of Pizá Brothers.

*Second.* As to the valuation of the plantation "Santa Bárbara," which the respondent estimates at eighty thousand dollars ($80,000) and the appellants at sixty thousand dollars ($60,000).

*Third.* As to the valuation of the profits yielded by the plantations of "Santa Bárbara" and "Sabana Seca," which were estimated by the respondent at twenty thousand dollars

($20,000) and which according to the appellants had no value whatever on the date on which the action was brought.

In order to decide the first point of disagreement between the parties to this suit, we must state that it does not appear to have been proven by the evidence introduced that the respondent Gandía was a special partner of the firm of Pizá Brothers, but, on the contrary, he had no such character, and that he was simply an employe and attorney in fact of the firm, with a fixed salary of one hundred and forty dollars ($140) per month and a compensation of ten per cent (10%) of the net profits of the same in addition thereto.

In the written contract of partnership introduced as evidence in this case Gandía has no standing as a partner of the firm; according to the aforementioned contract he made no obligation to devote his activities to the partnership referred to; but, on the contrary, it appears from the aforesaid written instrument that he had no other capacity than that of an employe and attorney in fact.

And it is admitted, in his brief and argument, by the distinguished counsel for appellants, that plaintiff was an employe of the defendants, but he claims that he was also an "industrial partner" by force of the statute law on that subject. In making this claim counsel overlooks the provisions of section 1224 of the Civil Code which settles the question adversely to appellants.

This point having been settled, let us now see in what form the ten per cent (10%) of the net profits belonging to Mr. Gandía by virtue of his verbal contract with Antonio Pizá, the only managing partner of the defendant mercantile firm, ought to be liquidated.

From the testimony of the witnesses we arrive at the conclusion that the only agreement existing between the respondent and Antonio Pizá was that the former was to receive as full compensation for his services rendered to the said firm one hundred and forty dollars ($140) per month, and, besides, ten per cent (10%) of the net profits; and that

there was no proposal nor agreement made with the afore-
said Ricardo Gandía to the effect that the profits were to be
distributed in the manner alleged by the appellants, which
is the same set forth in one of the clauses of the deed of
partnership of Pizá Brothers, the mercantile firm.

The statements contained in the deed with regard to
this point cannot prejudice Gandía because, as far as the
evidence discloses, he did not accept the same nor did he
agree to them in any form nor did he make any agreement
in any form whatever with the defendant partnership in
regard to this matter; and both the parties must abide by
the verbal contract made by them, which did not determine
the form of the payment of the ten per cent (10%) in the
manner stated in the deed of partnership. That the contract
relating to the services of Gandía, which was made between
the latter and the defendant firm, was in the form stated
by the respondent is further corroborated by the fact that
in the balances struck by the defendant firm in the years
1904, 1905 and 1906, after the date of the deed of partner-
ship which contains the clause referred to, the aforesaid firm
has credited to the account of Gandía the ten per cent (10%)
as his share of the profits; and that during said time he has
not only disposed of his entire salary, but also of more than
five thousand dollars ($5,000) due to him as the amount of
the said ten per cent (10%) derived from the net profits of
the business. This was invariably available to the plaintiff
in cash whenever he chose to draw the same from the coffers
of his employers.

It is true that in the last two balances struck during the
years 1907 and 1910 the defendant firm follows a different
system; but said firm shows by the new system that the
share of the profits, which in said balances belong to the
respondents, received from them the same consideration as
before. In the previous balances the name of the respondent
figured among the creditors of Pizá Brothers; but on dis-
tributing the capital of the firm in 1907 and 1910 said firm

distributed to the respondent nine thousand four hundred and fifty dollars and thirty-three cents ($9,450.33) in the year 1907 and seven thousand seven hundred and eighty-nine dollars and eighty-seven cents ($7,789.87) in 1910, which sums are not the amounts of the unliquidated profits belonging to the respondent up to said years, but the balances of the account current of Gandía at the date of each of those balances, and in which account current the share of the profits belonging to the respondent in each balance figured as cash of his own. This is the answer which the appellants at those dates give to the question under discussion. As a result of the aforesaid facts, we arrive at the conclusion that Ricardo Gandía is entitled to his profits, not in the form alleged by the appellants—that is, to be paid proportionately in all kinds of properties—but as net profits to be placed to his credit and paid to him in cash after the balances have been properly made.

The first point in controversy having thus been thoroughly considered and decided, let us now proceed to the second. The appellants acknowledge, in the ninth item of their answer made as defendants in the suit, that the account current of the plaintiff shows a balance in his favor of seven thousand four hundred and sixty dollars and seventy cents ($7,460.70). The appellants also acknowledge in the fifth item of their said answer that for the purposes of the balance made in connection with the liquidation which took place on account of the termination of the contract of the respondent, the value of the plantation "Santa Bárbara" was fixed at sixty thousand dollars ($60,000) and since there had been an inventory and balance on January 15, 1910, it was accepted by both parties, in all its parts, excepting the valuation of "Santa Bárbara" and the valuation of the profits derived from the crops of said plantation, and the former is set down with the value of twenty thousand five hundred and eighty-four dollars and sixty-seven cents ($20,584.67). It is thus clear that the appellants acknowlededge that the

plantation "Santa Bárbara" ought to figure in the balance of liquidation with an increase of its value representing the difference between the value given to said plantation by the appellants, which is sixty thousand dollars ($60,000) and the value of twenty thousand five hundred and eighty-four dollars and sixty-seven cents ($20,584.67)—that is to say, thirty-nine thousand four hundred and fifteen dollars and thirty-three cents ($39,415.33)—of which amount ten per cent (10%) of this three thousand nine hundred and forty-one dollars and fifty-three cents ($3,941.53) belong to the plaintiff.

Consequently, the appellants have thus admitted that they owe to the respondent.

| | | |
|---|---|---|
| (a)  The balance of account current_____ | $7, 416. 70 |
| (b)  Ten per cent of the difference in the value of "Santa Bárbara" _____ | 3, 941. 53 |
| Making a total of_____ | 11, 358. 23 |

Then the discussion at this point arrives at the question, whether the value of the plantation "Santa Bárbara" is sixty thousand dollars ($60,000) as stated by the appellants, or eighty thousand dollars ($80,000) as is maintained by the respondent, and whether the profits and crops of "Santa Bárbara" and "Sabana Seca" were worth twenty thousand dollars ($20,000) at the time when the employment of the respondent terminated, or if no liquidation of the same can be made up to that time, at the date of the trial, and consequently no credit should be given to respondent therefor.

In the inventory of 1902 of the stock belonging to the company or firm, Pizá Brothers, the plantation "Santa Bárbara" does not figure as part of the capital of said firm, because the acquisition of said plantation took place later on and was one of the many transactions to which the aforesaid firm devoted itself in the regular pursuit of its business.

This is also proven by the testimony of Servando Pico, a witness for the defendants, who testified that said plantation figures among the accounts of the firm the same as any

other account; that it was acquired with the capital of the firm during the course of their transactions in November, 1902.

That the plantation "Santa Bárbara" was worth more than sixty thousand dollars ($60,000) on the date on which the plaintiff ceased to be an employe of the defendant partnership is clearly shown by the evidence introduced at the trial.

In the balance struck on December 31, 1907, it is expressly stated that the net capital of the firm, which on said date amounted to one hundred and forty-nine thousand six hundred and twenty-three dollars and sixty-seven cents ($149,623.67) should really be estimated to be forty-nine thousand nine hundred and sixty-seven dollars and twenty cents ($49,967.20) *more* than that amount, because the plantation "Santa Bárbara" was figured at a value of twenty thousand and thirty-two dollars and eighty cents ($20,032.80) while the value of the same on the said date—that is, on December 31, 1907—was actually seventy thousand dollars ($70,000) on account of the crops existing on the same.

In regard to the inventory, we must point out that, although it appears from the copies furnished to the respondents by the appellants that in the entry above mentioned it was made to appear that the aforesaid value was given to said plantation "for the amount of the assets of the firm," it has been sufficiently shown to us by the evidence that when the balance was ready the aforesaid words, "for the amount of the assets of the firm," did not exist therein; and by a preponderance of the evidence it was also shown to us that when Ricardo Gandía ceased to be an employe of the mercantile partnership of Pizá Brothers, on March 11, 1910, those words had not been written and that they were written later on.

In view of this conclusion, we are of the opinion that the amount of seventy thousand dollars ($70,000) was stated as the value of the aforesaid property, not "for the amount of the assets of the firm," but simply because it was the value

at which the said plantation was estimated by the appellant partnership for any legitimate purpose whatever. But even supposing that the aforesaid amount had been stated "for the amount of the assets of the firm," we cannot believe that the appellants would have entered in their books a greater value than the real one to the prejudice of their connections, and to create a fictitious credit. After what has been said it must be admitted that the plantation "Santa Bárbara" must be worth at least seventy thousand dollars ($70,000), in the first place because said firm admitted in the answer to the complaint that the value of said plantation was sixty thousand dollars ($60,000) and, secondly, because in their own accounts, as appears on their books, the amount of seventy thousand dollars ($70,000) is fixed as the value of that property.

But in consequence of the evidence introduced by the plaintiff, we are of the opinion that the plantation has been shown *to possibly have* even a greater value than the amount above mentioned, and that it may be considered to be worth more than the eighty thousand dollars ($80,000) at which it was estimated by the respondent. The testimony which in regard to this point was given by the witnesses introduced leaves no doubt in our minds concerning this statement, to wit, that the plantation "Santa Bárbara," on March 11 of the year 1910, had a market value of eighty thousand dollars ($80,000) and of even more than that amount.

Then, if one makes with the sum of eighty thousand dollars ($80,000) the same operation that was made with the sixty thousand dollars ($60,000), at which amount the defendant firm estimated the plantation referred to, we arrive at the following results:

(a) Balance of the account current of Mr. Gandía_____ $7,416.70
(b) Difference between eighty thousand dollars ($80,-000), and twenty thousand five hundred and eighty-four dollars and sixty-seven cents ($20,584.67), with which the plantation "Santa Bárbara" pre-

viously appeared to be valued, amounting to fifty-
nine thousand four hundred and fifteen dollars and
thirty-three cents ($59,415.33), ten per cent (10%)
of which is_____:_____     5, 941. 53

Making a total of_____     13, 358. 23

Having thus disposed of two of the items of disagree-
ment between the parties to the controversy before us, we
must finally consider the third and only remaining one.

Then there is only lacking the item of two thousand dol-
lars ($2,000) to make up the full quota of what the respond-
ent, as plaintiff, claimed in his complaint and the amount
which was awarded to him in the judgment. How shall we
dispose of this item? Let us see.

When Ricardo Gandía, on March 11, 1910, ceased to be
an employe of the appellants' firm the latter had under
cultivation a large portion of the plantation of "Santa
Bárbara," which was planted in sugar-cane and pineapples,
and another tract of land situate in "Sabana Seca," which
was planted in pineapples only, and the question now under
discussion is whether these sugar-cane and pineapple fields
should be appraised and their value liquidated on the date
above mentioned, or whether such appraisment or liquidation
ought to remain pending until the crops should have been
gathered in order then to distribute the profits that might be
due to each party having a right in the distribution.

Inasmuch as Ricardo Gandía was only an employe and
attorney in fact of the firm Pizá Brothers his compensation
ought to have ceased, and in fact did cease, on the termination
of the duties which he discharged in the business of said firm;
and for that reason the value of the aforesaid cane and pine-
apple fields should have been liquidated at that time in order
to ascertain the amount of the ten per cent (10%) of the
value of the same to which he was entitled; and considering
that the said mercantile firm was disposed to liquidate on
March 11, 1910, the entire business of the partnership, and

even the increase in the value of the plantation "Santa Bár-
bara," in regard to which there was only a disagreement as
to the value of the same, we cannot understand why the same
thing should not be done with the cane and pineapple fields,
which undoubtedly had some value, on the date referred to,
be it ever so small.

The respondent is not obliged to suffer losses that may
have been sustained in connection with the fields above men-
tioned subsequent to the date on which he ceased to be an
employe of the mercantile firm, in case such losses may really
have been sustained; nor is he entitled either to a compen-
sation of ten per cent (10%) of the net profits realized after
the date on which his employment by the firm ceased, and
which profits might have been realized in consequence of
expenses incurred and care and labor bestowed by the mer-
cantile partnership on the cane and pineapple fields men-
tioned. Hence the value of the latter must be liquidated and
ascertained as it existed on the date of the termination of his
employment.

We hold, therefore, that the cane and pineapple fields
should have been appraised and valued on March 11, 1910, in
order to adjudge the share of ten per cent (10%) of the value
of the same to the employe who ceased to be in the employ of
the firm and who was under his contract of employment enti-
tled thereto in cash at that date.

According to the evidence heard by the trial court and
sent up in the record there existed on the plantation "Santa
Bárbara" on March 11 about one hundred and fifteen (115)
acres planted in sugar-cane slips and some twenty (20) acres
covered by sugar-cane stumps and, besides, eighty (80) acres
of pineapples; while at "Sabana Seca" there was another
tract of land of thirty (30) acres which was likewise planted
in pineapples.

The expert evidence heard by the court has shown that
the net value of the aforesaid sugar-cane on March 11 must
have been ten thousand five hundred and thirty dollars

($10,530) and that of the one hundred and ten (110) acres of pineapples, forty-four thousand dollars ($44,000) the aggregate amount of which, to wit, fifty-four thousand five hundred and thirty dollars ($54,530) represents a valuation which is more than twice as great as that of twenty thousand ($20,000), at which said value was estimated by the respondent in his pleadings and his own testimony.

However, since the respondent limited his demand in his complaint to ten per cent (10%) on twenty thousand ($20,000) we must add only the amount of said ten per cent (10%) which is two thousand dollars ($2,000), to the sum of thirteen thousand three hundred and fifty-eight dollars and twenty-three cents ($13,358.23) above stated, and thus we reach a grand total of fifteen thousand three hundred and fifty-eight dollars and twenty-three cents ($15,358.23) which is the same amount that is claimed in the complaint on which this action is founded, and the sum total awarded in the judgment from which this appeal is taken and which the appellant mercantile firm, Pizá Brothers, accordingly owes to Ricardo A. Gandía, the respondent.

Believing that the reasoning of the trial judge, in his opinion contained in the record, as well as the judgment rendered in this case, was correct and well founded in the law and the facts, we hold that it should be in all things affirmed.

*Affirmed.*

Chief Justice Hernández and Justices Wolf and del Toro concurred.

Mr. Justice Aldrey did not take part in the decision of this case.